**LEROY ADVENTURES, INC., Appellant,**

v.

**CAFRITZ HARBOUR GROUP, INC., et al., Appellees.**

No. 92–CV–321.

District of Columbia Court of Appeals.

Argued May 11, 1993.
Decided April 18, 1994.

Charles R. Donnenfeld, with whom Robert A. Salerno, Washington, DC, was on the brief, for appellant.

William J. Bowman, with whom Kevin P. Gallagher, Washington, DC, was on the brief, for appellees.

Before FERREN, Acting Chief Judge,[*] and TERRY, Associate Judge, and GALLAGHER, Senior Judge.[**]

TERRY, Associate Judge:

This case arises out of the bankruptcy of the Potomac restaurant and the subsequent settlement of claims which followed the closing of the restaurant. Appellant, LeRoy Adventures, Inc., contends that the trial court improperly dismissed its suit against the three appellees, Cafritz Harbour Group, Inc., IBC Realty, Inc., and Cafritz Harbour Investment Limited Partnership. LeRoy Adventures had sued these three entities individually and as general partners in Potomac Riverfront Limited Partnership ("PRLP").

PRLP owns part of a commercial real estate development in the District of Columbia known as Washington Harbour. In September 1983 Cafe Partners/Washington 1983 ("Cafe Partners")[1] (the tenant) leased a certain portion of Washington Harbour from Washington Harbour Associates ("WHA" or "the landlord"), the predecessor of PRLP. In the leased premises Cafe Partners owned and operated a restaurant called the Potomac, which it developed with capital obtained through two loans, one from WHA and the other from Royal Bank and Trust Company ("Royal Bank").[2]

Following the restaurant's failure in 1987, Royal Bank, which had a lien on the equipment and fixtures in the Potomac, released Cafe Partners from liability on the loan in exchange for ownership of the equipment and fixtures. Royal Bank immediately sold what it had just acquired to LeRoy Adventures. After representatives of LeRoy Adventures had removed some of the equipment, the landlord barred them from entering the premises to remove the remainder, specifically the heating, ventilating, and air conditioning equipment ("HVAC"). In so do-

ing, the landlord relied on an earlier settlement agreement between Cafe Partners and WHA, which provided that any property of Cafe Partners not removed from the leased premises within sixty days would become the property of WHA. In addition, the landlord maintained that the HVAC was not the type of property that Cafe Partners, or its successor in interest LeRoy Adventures, was authorized under the lease to remove.

LeRoy Adventures then filed this suit in the Superior Court, alleging breach of contract and negligence and seeking damages and a variety of equitable remedies. Following a three-day non-jury trial, the court held that the HVAC was not removable under the terms of the original lease agreement between Cafe Partners and WHA. Alternatively, the court ruled that even if the HVAC was removable under the lease, Cafe Partners had had only sixty days from the time specified in the settlement agreement within which to remove it, and that after the sixty days had expired, the HVAC and other personal property remaining on the leased premises "belonged to the landlord." Additionally, the court concluded that Royal Bank had lost its lien on the property in the restaurant because it had failed to object to the settlement agreement between Cafe Partners and WHA, in which Cafe Partners had agreed to relinquish its rights in the property after sixty days.

The facts surrounding this controversy are complex, and the issues are difficult. Despite the trial court's exacting attention to the intricacies of the case, we hold that the court erred in ruling that Royal Bank was bound by a settlement agreement to which it was not a party. Additionally, the trial court erred in interpreting the Potomac's lease agreement so as to conclude that the HVAC was not removable property. We therefore

[*] Judge Ferren was an Associate Judge of the court at the time of argument. His status changed to Acting Chief Judge on March 18, 1994.

[**] Former Chief Judge Rogers was a member of the division that heard oral argument in this case. After her departure from the court, Judge Gallagher was selected by lot to replace her.

1. Cafe Partners was a limited partnership whose general partner was LeRoy Productions, Inc.

LeRoy Productions was controlled by Warner LeRoy. Mr. LeRoy is also the sole shareholder in LeRoy Adventures, Inc., a corporation which owns another restaurant in New York, the Tavern on the Green.

2. Royal Bank and Trust Company is a New York corporation affiliated with the Royal Bank of Canada.

reverse the trial court's dismissal of appellant's claim for relief and remand the case for further proceedings.

## I. THE EVIDENCE AT TRIAL AND THE COURT'S RULING

In September of 1983 Cafe Partners and WHA entered into a lease for several thousand square feet of space in Washington Harbour. WHA, the landlord, provided only the bare space, which Cafe Partners agreed to transform into a "spectacle" restaurant. Cafe Partners financed the interior work through a loan from the landlord for two million dollars and another loan from Royal Bank, also for two million dollars. As collateral for its loan, Royal Bank was given a security interest in certain tangible and intangible property, as set forth in one of the loan documents:

> All accounts receivable, contract rights, goods, equipment, inventory, fixtures, furniture and farm products of the Debtor and all other personal property of every type and nature of the Debtor (including, without limiting the generality of the foregoing, all leasehold improvements now or hereafter located on Lot 102, Square 1173 in the District of Columbia), and any instruments, documents, chattel paper and general intangibles relating thereto or arising therefrom ... and all cash and noncash proceeds (including proceeds of insurance) and products thereof.

On the same day that Royal Bank entered into the loan agreement with Cafe Partners, Royal Bank and WHA entered into a separate agreement whereby WHA subordinated its interest in the collateral to Royal Bank. This "subordination agreement," which was signed by representatives of WHA, Cafe Partners, LeRoy Productions, Inc., and Royal Bank, explicitly made reference to the lease between WHA and Cafe Partners and stated that WHA agreed to hold a junior lien in order to induce Royal Bank to make the loan to Cafe Partners.

Despite its glitzy decor, the Potomac restaurant was a failure and closed its doors in October 1987. Cafe Partners then filed suit against the landlord (WHA), asserting that the landlord had breached the lease agreement, thereby causing the restaurant to fail. That suit was settled by a Joint Settlement Agreement ("JSA–1") entered into on December 20, 1988, by WHA, LeRoy Productions, Inc., and Cafe Partners. Under the terms of JSA–1, each of the respective parties was released from its obligations. JSA–1 also contained a provision whereby WHA "waived and relinquished" any landlord's lien or other security interest it might otherwise have in the personal property of LeRoy Productions, Inc., or Cafe Partners. Paragraph 16 of JSA–1 provides in part:

> Upon the earlier of the expiration of the time to object, or the entry of a final nonappealable order of the Bankruptcy Court ... Cafe Partners/Washington 1983, and LeRoy Productions, Inc., shall surrender actual physical possession of the Leased Premises, and shall remove as promptly as practicable any of their personal property. Cafe Partners/Washington 1983 and LeRoy Productions, Inc., shall not remove any of the equipment listed in Exhibit "B" [kitchen equipment] ... nor shall they be deemed hereby to have any claim to, right in, or title to any of the Washington Harbour Equipment.... *Any personal property remaining in the Leased Premises more than sixty (60) days thereafter shall be deemed to be Washington Harbour's property free of any claim by Cafe Partners/Washington 1983, or LeRoy Productions, Inc.* [Emphasis added.]

Notice of JSA–1 was filed on January 12, 1989, in the bankruptcy court where proceedings relating to Cafe Partners were under way. The trial court in this case found that Royal Bank had notice of JSA–1 and held that, by not objecting to it, Royal Bank gave up its status as a senior lienholder and became subject to the sixty-day provision of JSA–1.

■ On February 9, 1989, Cafe Partners entered into a second Joint Settlement Agreement ("JSA–2"), this time with Royal Bank. JSA–2 recited that in January 1984 Cafe Partners, in return for a loan from Royal Bank, had granted to Royal Bank

> a security interest in all of its accounts receivable and, among other things, in all of its goods, equipment, inventory, fix-

tures, furniture and all other personal property, including all leasehold improvements, located at the premises on which the restaurant was to be built (the "Equipment").

JSA–2 further stated that Cafe Partners had defaulted on its loan, and that Royal Bank "proposes to take possession of and retain the Equipment and accept the payment of certain [other] funds ... in full satisfaction of Cafe Partners' obligations" under the loan agreement, the note, and the subordination agreement. Cafe Partners then designated Royal Bank as its agent under JSA–1 "for the purpose of entering onto the Leased Premises and taking possession of the Equipment remaining at the Leased Premises." The effect of JSA–2 was to give Royal Bank possession of the collateral for its loan in lieu of foreclosure of its security interest.[3] Royal Bank in return agreed to deliver to Cafe Partners the "original executed copy of the Credit Note [marked] 'paid in full.'"

On the same day, Royal Bank entered into a "Purchase and Sale Agreement" with LeRoy Adventures. Under this agreement, Royal Bank sold to LeRoy Adventures all of the equipment that it had just acquired from Cafe Partners. A few weeks later, in accordance with the Purchase and Sale Agreement, Royal Bank filed with the District of Columbia Recorder of Deeds a "UCC–3 Termination Statement" which stated that Royal Bank "no longer claims a security interest" in the equipment that had been the collateral for its loan to Cafe Partners. LeRoy Adventures then began the process of removing various items from the now-defunct restaurant. On April 28, 1989, the attorney for LeRoy Adventures sent a letter to WHA's attorney "per our discussion" suggesting the possible purchase by WHA of the property owned by LeRoy Adventures which still remained on the leased premises.[4]

The trial court concluded that Royal Bank, although a senior lienholder, gave up its rights in the property by failing to object in the bankruptcy court to JSA–1. Therefore, LeRoy Adventures, as successor to the interests of Royal Bank, had no actionable claim under any theory, i.e., contract or tort, against the landlord. According to the court, the equipment became the property of the landlord (WHA) following the passage of sixty days under JSA–1. Furthermore, the court concluded that although the HVAC could in fact be removed without "irreparably damaging" the realty, it did not fall within the term "personal property" in the lease agreement, and therefore was not the type of property that Cafe Partners could remove upon vacating the premises. The court also ruled, in the alternative, that even if the HVAC was the type of property that Cafe Partners would be entitled to remove, the failure to remove it within the sixty-day period under JSA–1 meant that it, along with all other property (e.g., pots and pans) remaining on the premises, reverted to the landlord. The court therefore granted the landlord's motion for involuntary dismissal of LeRoy Adventures' claim under Super.Ct.Civ.R. 41(b).

## II. ROYAL BANK'S FAILURE TO OBJECT TO JSA–1

As a preliminary matter, we must first address whether Royal Bank's rights in the collateral were affected by JSA–1, the agreement between Cafe Partners and the landlord, to which Royal Bank was not a party. Although the trial court acknowledged "that junior lienholders cannot deal away a senior lienholder's rights," it nevertheless concluded that Royal Bank's position had been altered by JSA–1. The court said that "in bankruptcy court, with notice, I rule that the senior lienholder [Royal Bank] can give up its senior rights.... It allowed its chances to enforce its lien slip away when it did not object to Cafe Partners giving up all its rights."

---

**3.** Appellees assert that Royal Bank's rights to the collateral are limited by this assignment by Cafe Partners. We do not agree. While it is elementary that Royal Bank could not obtain through the assignment greater rights to the collateral than Cafe Partners itself had, see page 199, *infra,* the assignment in no way limited or abrogated Royal Bank's *pre-existing* rights in the collateral

which resulted from the loan agreement and the subordination agreement.

**4.** Attached to this letter was a list of the property which LeRoy Adventures believed it had acquired in the purchase from Royal Bank. The HVAC was on that list.

The trial court's ruling was based on its interpretation of 11 U.S.C. § 362(d) (1988). The court seems to have believed that Royal Bank was under some sort of duty to object to Cafe Partners' relinquishment (in JSA–1) of its rights to all personal property on the leased premises, subject to the sixty-day right of retrieval, and that Royal Bank's "failure to object means that [JSA–1] goes into effect automatically." We hold that this ruling was error.

■ Section 362(d) empowers the bankruptcy court, on request of an interested party and after notice and a hearing, to grant relief from the automatic stay that arises in bankruptcy proceedings under 11 U.S.C. § 362(a).[5] But the lifting or modification of a stay has no effect on the validity of a lien. The trial court apparently concluded that Royal Bank's failure to object to JSA–1 was analogous to a failure to request relief from the automatic stay, so that the running of the sixty days under JSA–1 forever barred Royal Bank from exercising whatever rights it may have had in the property. What the court overlooked, however, was that Royal Bank was under no obligation to take any steps whatsoever in the bankruptcy proceedings to preserve its pre-existing rights, because they were not affected by the bankruptcy. *See Chandler Bank of Lyons v. Ray,* 804 F.2d 577, 579 (10th Cir.1986) ("unavoided liens pass through [bankruptcy proceedings] without any action by the lien holder"); *In re*

*Sillani,* 9 B.R. 188, 189 (Bankr.S.D.Fla.1981) ("liens pass through the bankruptcy case unaffected"); 11 U.S.C. § 541(d) (1988).[6]

■ There is nothing in the record to suggest that JSA–1, even though it was filed with the bankruptcy court, had any effect other than to notify creditors that Cafe Partners, the debtor, was entering into an agreement releasing any claims it might have had against WHA. Moreover, there is no support in the Bankruptcy Code for the trial court's conclusion that Royal Bank was obliged, on pain of losing its rights as a senior lienholder, to make some affirmative challenge to JSA–1 in the bankruptcy court. We hold, therefore, that JSA–1 had no legal effect on the superiority of Royal Bank's interest in the collateral.

■ Nor is there any other basis in bankruptcy law for invalidating Royal Bank's lien. Even though Cafe Partners was in bankruptcy, there is no provision in the Bankruptcy Code which would permit Cafe Partners to transfer an interest in property that it did not own, *i.e.,* property which was subject to a lien. Only under limited circumstances, set forth in 11 U.S.C. § 363(f) (1988), can property be sold or transferred in a bankruptcy proceeding free and clear of a third party's interest in that property.[7] We find nothing in section 363(f) which would permit Royal Bank's lien to be terminated

---

5. 11 U.S.C. § 362(d) provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> (A) the debtor does not have an equity in such property; and
> (B) such property is not necessary to an effective reorganization.

6. As appellant points out, a bankruptcy court may order or authorize a sale of the debtor's property free and clear of all liens, but only in certain limited circumstances not present here, and only after special procedures are followed.

Even then, the lien is not nullified, but merely attaches to the proceeds of the sale. *See In re Riverside Investment Corp.,* 674 F.2d 634, 640 (7th Cir.1982).

7. 11 U.S.C. § 363(f) provides:

> The trustee [in bankruptcy] may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all such liens on such property;
> (4) such interest is in a bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

without any action on Royal Bank's part, or without its consent. Moreover, even if JSA–1 were construed as effecting a transfer or sale of the property to WHA after the passage of sixty days, the property still remained subject to Royal Bank's interest. Absent an order from the bankruptcy court permitting the sale to be free and clear of other interests, WHA would take the property subject to Royal Bank's superior interest, created in part by the earlier subordination agreement between WHA and Royal Bank. *See generally* 1 L. KING, COLLIER BANKRUPTCY MANUAL ¶ 363.06[1] (1991). That interest, which was purchased from Royal Bank by LeRoy Adventures, would support LeRoy's present claim against WHA.

Because there was no order of the bankruptcy court which might arguably have invalidated Royal Bank's lien, and because the trial court's conclusion that Royal Bank acquiesced in the cancellation of its lien by failing to object in bankruptcy court to JSA–1 is without legal support, we hold that the trial court erred in ruling that Royal Bank's rights in the property were extinguished after the passage of sixty days under JSA–1.

### III. THE EFFECT OF THE TWO JOINT SETTLEMENT AGREEMENTS

■ The central issue for us to decide, then, is what effect, if any, the agreement between Cafe Partners and WHA (JSA–1) had on the right of LeRoy Adventures to remove the property from the leased premises, a right it received from Royal Bank in the Purchase and Sale Agreement after Royal Bank had received it from Cafe Partners in JSA–2. It is, of course, beyond dispute that LeRoy Adventures can have no greater rights than Royal Bank had. *Fox–Greenwald Sheet Metal Co. v. Markowitz Bros., Inc.,* 147 U.S.App.D.C. 14, 25 n. 69, 452 F.2d 1346, 1357 n. 69 (1971) (assignee stands in

8. Royal Bank's lien also antedated Cafe Partners' bankruptcy, so that any interest Cafe Partners had in the collateral was subject to the lien notwithstanding the bankruptcy proceedings.

9. Since Cafe Partners could rightfully remove items of property so long as their removal did not result in irreparable damage to the realty, see part IV, *infra*, it follows that Royal Bank could exercise the same right. *See Gibson v. Exchange*

shoes of assignor, deriving the same but no greater rights and remedies than those possessed by assignor); *accord, Active Fire Sprinkler Corp. v. United States Postal Service,* 811 F.2d 747, 755 (2d Cir.1987). However, because Royal Bank had independent, pre-existing rights deriving from its loan agreement with Cafe Partners and its subordination agreement with WHA, both of which antedated JSA–1,[8] Royal Bank's rights were not limited by JSA–1, to which it was not even a party.

While it is true that JSA–2 granted Royal Bank certain rights and permitted Royal Bank to act on behalf of Cafe Partners in removing equipment from the leased premises,[9] the rights Royal Bank received under JSA–2 were *in addition to,* not in abrogation of, the rights that Royal Bank had earlier obtained through the loan agreement and subordination agreement. In particular, Royal Bank's right of removal was not restricted by the sixty-day limit imposed by JSA–1 on Cafe Partners' right of removal. *See Gibson, supra* note 9, 172 Okla. at 106–107, 42 P.2d at 512–513. In *Gibson,* as in this case, the tenant surrendered possession of the leased premises during the term of the lease by agreement between himself and the landlord. The *Gibson* court held: " 'That the leasehold has been surrendered by the tenant does not, by the weight of authority, affect the right of removal by one to whom the fixture has previously been transferred or mortgaged.' " *Id.* at 107, 42 P.2d at 513 (citation omitted); *see In re Producers Energy Corp.,* 11 B.R. 669, 675–676 (Bankr. W.D.Okla.1981) (lessor could not object to removal of equipment by bank foreclosing on its security interest in that equipment when lessee had right of removal under lease). Thus JSA–1 had no effect on the ability of Royal Bank—and, in turn, LeRoy Adventures—to exercise its independent rights.[10]

*Nat'l Bank of Pauls Valley,* 172 Okla. 106, 106–107, 42 P.2d 511, 512 (1935).

10. We are bolstered in our conclusion by the fact that the landlord knew at all relevant times (especially at the time it subordinated its interest) that Royal Bank had a senior secured interest in the property located on the leased premises. *Cf. Central Chrysler Plymouth, Inc. v. Holt,* 266 N.W.2d 177, 180 (Minn.1978) (when landlord

■ The *Gibson* court continued: "Simple justice requires that the mortgagee [in this case, Royal Bank] be given an opportunity and a reasonable time to remove mortgaged property from the leased premises when the lease has been surrendered by the tenant prior to the expiration of the term." 172 Okla. at 107, 42 P.2d at 513. We agree. In the case at bar, Cafe Partners surrendered the premises before the end of the term pursuant to its agreement with WHA (JSA–1). Royal Bank was therefore entitled to a reasonable period of time within which to remove the collateral from the leased premises in settlement of the debt owed by Cafe Partners.

Relying on a strained reading of JSA–2, appellees contend that JSA–2 "extinguished" Royal Bank's security interest in the property "as a matter of law." On the contrary, we read JSA–2 as giving Royal Bank the *additional* right, over and above what it already had (*i.e.*, its security interest), to enter the leased premises and take possession of the collateral. In return for that right, Royal Bank agreed to cancel Cafe Partners' debt and to deliver to Cafe Partners the promissory note marked "paid in full." There is no other reasonable way to construe JSA–2.

■ Appellees also argue that Royal Bank relinquished its lien by filing the "UCC–3 Termination Statement" with the Recorder of Deeds. We hold, however, that the UCC–3 had no effect on Royal Bank's rights because under JSA–2 it had acquired the right to *actual possession* of the property. Indeed, appellant asserts on appeal that Royal Bank's security interest was "converted to ownership" by JSA–2. We agree that JSA–2 at least gave Royal Bank *de facto* ownership, which superseded its mere security interest.[11] Moreover, by the time Royal Bank filed the UCC–3, it had already transferred to LeRoy Adventures its interest in the property. Thus the filing of the UCC–3, which

stated that Royal Bank "no longer claims a security interest" in the property, had no effect on its newly acquired rights under JSA–2.

## IV. THE STATUS OF THE HVAC

■ After looking at the lease between Cafe Partners and the landlord, the trial court also concluded that the HVAC did not fall within the category of "personal property" which Cafe Partners owned and which could be removed from the premises upon termination of the lease. Section 1.05(a) of the lease provides in pertinent part:

> All repairs, alterations, additions and improvements made by Tenant and affixed to the realty and which cannot be removed without *irreparably damaging* realty shall be deemed to be attached to the leasehold and to have become the property of Landlord upon such attachment, and upon the expiration or sooner termination of this Lease. Tenant shall not remove any of such alterations, additions and improvements unless instructed to the contrary by Landlord. Subject to the following, Tenant, at its expense, shall remove all personal property of Tenant including trade fixtures and equipment and shall repair all damage to the Leased Premises caused by such removal. All property not so removed shall be deemed to have been abandoned by Tenant and to have become the property of Landlord and may be retained or disposed of by Landlord as Landlord shall desire at the expense of Tenant. [Emphasis added.]

Contrary to the trial court's impression, we hold that because the HVAC can be removed from the premises without causing irreparable damage to the realty, it was an item of equipment that the tenant had the right to remove upon vacating the premises. The lease makes clear that any additions or improvements to the realty by the tenant,

---

knows that tenant has conditionally sold fixtures to subsequent tenant, original tenant is not deemed to have abandoned fixtures upon moving out at end of lease term, and landlord may not claim ownership of fixtures).

**11.** Whether JSA–2 gave Royal Bank *de jure* ownership as well is a question we need not decide,

since it may implicate aspects of the bankruptcy proceedings of which we are not aware. For the purposes of this appeal, we need only conclude—as we do—that Royal Bank's (and hence LeRoy Adventures') rights in the property are superior to those of the landlord or any of the appellees.

which under other circumstances might be considered fixtures,[12] may be removed if such removal can be accomplished without irreparably damaging the realty. Since the evidence showed, and the trial court found, that the HVAC could be removed without irreparably damaging the realty, it follows that the HVAC was an item that the tenant could remove under the plain language of the lease.

 Moreover, any language in a lease that limits the tenant's right of removal is strictly construed in favor of the tenant. 36A C.J.S. *Fixtures* § 15(c) (1961). In the present case such construction supports only one conclusion: that although the HVAC may have been annexed to the realty, it retained "its character as personalty or [was] subject to removal by the person who made the annexation, in this case the tenant, by reason of an agreement to that effect." *Id.* at § 15(b) (footnote omitted). It is settled and often stated that contract interpretation is a question of law where the interpretation does not depend on extrinsic evidence. *E.g., Sacks v. Rothberg,* 569 A.2d 150, 155 (D.C. 1990); *Dodek v. CF 16 Corp.,* 537 A.2d 1086, 1093 (D.C.1988). We are satisfied that, as a matter of law, the lease must be read as permitting the removal of the HVAC by Cafe Partners, and hence by Royal Bank and, in turn, LeRoy Adventures. *Cf. In re Smith Materials Corp.,* 108 B.R. 784, 787 (Bankr. M.D.Fla.1989) ("a provision prohibiting such removal in certain circumstances 'indicates that the parties themselves contemplated the removal of all fixtures' in certain other circumstances" (citation omitted)).

## V. CONCLUSION

In sum, we hold that (1) Royal Bank's failure to object to JSA–1 in the bankruptcy court did not extinguish or affect in any way its rights as a senior lienholder in the property which served as collateral for its loan; (2) by virtue of its pre-existing lien, which was not affected by the bankruptcy proceedings, Royal Bank's rights in the property were superior to those of the landlord (WHA), the landlord's successor (PRLP), and all of the appellees; (3) under JSA–2, Royal Bank acquired at least *de facto* ownership of that property, which it immediately conveyed to LeRoy Adventures, along with all its other rights in the property; and (4) because the HVAC could be removed from the premises without irreparably damaging the realty, Royal Bank—and its successor in interest, LeRoy Adventures—had a right to remove it within a reasonable time after the restaurant closed its doors. We therefore reverse the judgment of the trial court and remand this case for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

12. *See* 36A C.J.S. *Fixtures* § 1 (1961) (definition of fixture is "flexible"). In determining whether an item is a fixture, the intent of the party attaching it to the realty "is the primary test, the one of paramount importance," and has been said to be controlling. *Id.* at § 2(a). To determine that intent in this case, we look to the language of the lease, specifically the "irreparably damaging" language.