**LEROY ADVENTURES, INC., Appellant,**

v.

**CAFRITZ HARBOUR GROUP, INC., et al., Appellees.**

**No. 92–CV–321.**

District of Columbia Court of Appeals.

June 29, 1995.

---

Charles R. Donnenfeld, with whom Robert A. Salerno, Washington, DC, was on the brief, for appellant.

William J. Bowman, with whom Kevin P. Gallagher, Washington, DC, was on the brief, for appellees.

Before FERREN and TERRY, Associate Judges, and GALLAGHER, Senior Judge.

PER CURIAM:

This case involves certain claims arising out of the bankruptcy and closing of the Potomac Restaurant. In our earlier opinion, *Leroy Adventures, Inc. v. Cafritz Harbour Group, Inc.*, 640 A.2d 193 (D.C.1994) (*Leroy*

*I* ), we reversed the trial court's dismissal of appellant's complaint and remanded the case for further proceedings. Appellees filed a petition for rehearing, raising several points. We remain convinced that the result of our prior opinion is sound, namely, that the complaint was erroneously dismissed and that further proceedings in the trial court are required. Having considered the petition for rehearing, however, we find that our analysis has been misunderstood and needs to be clarified. We are also persuaded that we made a mistake in saying that "as a matter of law, the lease must be read as permitting the removal" of the hearing, ventilating, and air conditioning equipment ("HVAC"). *Id.* at 201. We therefore grant the petition for rehearing and partially modify our prior decision.

Part I of the opinion that follows is a brief summary of the facts pertinent to the petition for rehearing. For a fuller understanding of the facts, we invite the reader's attention to our opinion in *Leroy I,* 640 A.2d at 195–197. Part II explains—more clearly than before, we trust—some of our reasons for reversing the dismissal of the complaint. Part III modifies, in part, our prior holding with respect to the HVAC.

I

Cafe Partners leased property from Washington Harbour Associates ("WHA") to establish the Potomac Restaurant. Royal Bank and Trust Company ("Royal Bank") lent money to Cafe Partners in exchange for (1) a security interest in Cafe Partners' "accounts receivable, contract rights, goods, equipment, inventory, fixtures, furniture, and farm products," and (2) a subordination agreement with WHA which provided that Royal Bank's interest in the collateral was superior to WHA's interest in the collateral.

Cafe Partners failed to meet its obligations under the lease with WHA, and as a result Cafe Partners and WHA entered into a Joint Settlement Agreement which our prior opinion designated as "JSA–1." JSA–1, in which Royal Bank did not participate (and by which Royal Bank was therefore not bound [1]), re-

---

1. In part II of our previous opinion, 640 A.2d at 197–199, we held that because Royal Bank was

leased each of the three parties[2] from its obligations and gave WHA title to any property remaining on the leased premises more than sixty days after "the earlier of the expiration of the time to object, or the entry of a final non-appealable order of the Bankruptcy Court" in which Cafe Partners' bankruptcy case was pending.

Cafe Partners also failed to meet its obligations under the loan agreement with Royal Bank, and as a result Cafe Partners and Royal Bank entered into another Joint Settlement Agreement ("JSA–2"). JSA–2 gave Royal Bank title to Cafe Partners' assets in full satisfaction of Cafe Partners' obligations under the loan agreement. In JSA–2 Cafe Partners designated Royal Bank as its agent under JSA–1 "for the purpose of entering onto the Leased Premises and taking possession of the Equipment remaining at the Leased Premises." Royal Bank then sold to appellant LeRoy Adventures ("LeRoy") all of the equipment it had just "acquired" from Cafe Partners pursuant to JSA–2. A few weeks later, Royal Bank filed with the Recorder of Deeds a UCC–3 Termination Statement, which stated that Royal Bank "no longer claims a security interest" in Cafe Partners' assets.

LeRoy removed from the leased premises many of the assets it had purchased from Royal Bank, but at some time after the expiration of the sixty-day period described in JSA–1, the landlord (WHA) barred LeRoy from entering the premises to remove the rest of the assets, including the HVAC. In preventing LeRoy from entering, WHA relied on the provision in JSA–1 that any property remaining on the premises after sixty days would become WHA's property. In addition, WHA maintained that the HVAC, in any event, "was not the type of property that Cafe Partners, or its successor in interest LeRoy Adventures, was authorized under

the lease to remove." *Leroy I,* 640 A.2d at 195.

## II

■ The first issue on rehearing concerns our previous conclusion that "[t]he effect of JSA–2 was to give Royal Bank possession of the collateral for its loan *in lieu of foreclosure of its security interest." Id.* at 197 (emphasis added). It appears from appellees' petition for rehearing that this language may have been misleading. The petition states:

> If Royal Bank had wanted to foreclose upon its lien and thereby "convert" the lien to ownership, it had several legal options: (1) institute judicial foreclosure proceedings as permitted by U.C.C. § 9–501; (2) follow the strict foreclosure requirements of U.C.C. § 9–504; or (3) repossess the collateral under U.C.C. § 9–503 and retain it under § 9–505.... It is undisputed that Royal Bank—no novice to the world of secured transactions—chose none of these courses. Instead, as the panel recognized, it elected to release its lien and effect a settlement with Cafe Partners "in lieu of foreclosure of its security interest." When it did so, however, Royal Bank received no greater rights than those possessed by Cafe Partners—*i.e.,* the right to remove the personal property within 60 days—and only these rights were then transferred to [LeRoy Adventures.]

We did not mean to conclude that JSA–2 was an alternative to Royal Bank's foreclosure, but rather that JSA–2 was the functional equivalent of foreclosure. JSA–2 announced the terms of Royal Bank's strict foreclosure, pursuant to D.C.Code § 28:9–505(2) (1991),[3] of its security interest in Cafe Partners' assets, thereby giving Royal Bank a possessory interest in the collateral.

not a party to JSA–1, its rights were not affected in any way by JSA–1. That holding is not altered by this opinion on rehearing.

**2.** The parties to JSA–1 were WHA, Cafe Partners, and LeRoy Productions, Inc. Cafe Partners was a limited partnership in which LeRoy Productions was the general partner. *See Leroy I,* 640 A.2d at 195 n. 1.

**3.** Title 28, Subtitle I of the District of Columbia Code contains the Uniform Commercial Code (UCC) as enacted in the District of Columbia. All of the sections of Title 28 cited in this opinion are part of the UCC.

D.C.Code § 28:9–501 provides: "When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this part [Part 5 of UCC Article 9] and except as limited by subsection (3) those provided in the security agreement." Part 5 of Article 9 lists several rights and remedies available to the secured party upon the debtor's default. These remedies include the right of the secured party to take possession after default, D.C.Code § 28:9–503, and the right of the secured party to dispose of the collateral after default, D.C.Code § 28:9–504. An examination of JSA–2 clearly shows, however, that Royal Bank chose neither of these remedies but the strict foreclosure remedy made available under D.C.Code § 28:9–505(2): "acceptance of the collateral as discharge of [the] obligation."

■■■ Section 28:9–505(2) states that "a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation." [4] Under this section, a secured creditor (1) must take possession of the collateral after default; (2) must send written notice to the debtor of its intention to retain the collateral in satisfaction of the obligation, unless the debtor has "signed after default a statement renouncing or modifying his rights under this subsection," *see Fletcher v. Cobuzzi,* 499 F.Supp. 694, 699 (W.D.Pa.1980); (3) must send notice of its intent to foreclose to any other creditor of the debtor who has previously sent the secured creditor written notice of a claim of interest in the collateral, *see* 2 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 27–8, at 587 (3d ed. 1988) (hereafter WHITE & SUMMERS); and (4) may retain the collateral in satisfaction of the debtor's obligation if, within twenty-one days after sending notice, the secured creditor does not receive an objection in writing from some party entitled to notice. *See In re Leeling,* 129 B.R. 637 (Bankr.D.Colo.1991). Other foreclosure remedies in Article 9 allow the secured party to sue the debtor for a deficiency if a sale of the foreclosed collateral does not produce enough money to satisfy the debtor's obligation. *See* D.C.Code §§ 28:9–502, 28:9–504.[5] A secured party who chooses the remedy of strict foreclosure under section 28:9–505, however, foregoes the right to sue the debtor for any deficiency between the value of the collateral and the amount of the outstanding debt.[6] *See*

4. D.C.Code § 28:9–505(2) provides in part:

[A] secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if, except in the case of consumer goods, he has not signed after default a statement renouncing or modifying his rights under this subsection. In the case of consumer goods no other notice need be given. In other cases notice shall be sent to any other secured party from whom the secured party has received (before sending his notice to the debtor or before the debtor's renunciation of his rights) written notice of a claim of an interest in the collateral. If the secured party receives objection in writing from a person entitled to receive notification within twenty-one days after the notice was sent, the secured party must dispose of the collateral under section 28:9–504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation.

5. D.C.Code § 28:9–502(2) provides in part:

A secured party who by agreement is entitled to charge back uncollected collateral or otherwise to full or limited recourse against the debtor and who undertakes to collect from the account debtors or obligors must proceed in a commercially reasonable manner and may deduct his reasonable expenses of realization from the collections. *If the security agreement secures an indebtedness, the secured party must account to the debtor for any surplus, and unless otherwise agreed, the debtor is liable for any deficiency.* But if the underlying transaction was a sale of accounts or chattel paper, the debtor is entitled to any surplus or is liable for any deficiency only if the security agreement so provides.
[Emphasis added.]

6. The fact that Royal Bank immediately sold the collateral to LeRoy Adventures, rather than "retain[ing] the collateral," D.C.Code § 28:9–505(2), may have caused some uncertainty as to which foreclosure remedy Royal Bank chose to pursue. The fact that Royal Bank ultimately did not retain possession of the collateral is not relevant. More significant is the fact that JSA–2 provided for foreclosure *in full satisfaction* of Cafe Partners' obligation. Even if the proceeds from a sale of the collateral failed to satisfy in full Cafe Partners' outstanding obligation, JSA–2 precluded Royal Bank from suing Cafe Partners for the deficiency.

*Tanenbaum v. Economics Laboratory, Inc.,* 628 S.W.2d 769 (Tex.1982) (election of strict foreclosure remedy bars secured party from seeking deficiency judgment); 2 WHITE & SUMMERS § 27–8, at 585 (same).

In our prior opinion we failed to make clear that JSA–2 represented Royal Bank's attempt to comply with section 28:9–505(2).[7] First, JSA–2 described the process by which Royal Bank was to take possession of the collateral:

> Royal Bank or its authorized agents or contractors shall enter the Leased Premises, or such other premises where the Equipment (or any of it) is located, and take possession of the Equipment.

Second, JSA–2 provided Cafe Partners with notice of Royal Bank's intent to foreclose, and also stated that Cafe Partners renounced its rights to the collateral and consented to Royal Bank's foreclosure:

> At the closing, Royal Bank shall propose to Cafe Partners that Royal Bank *retain the Equipment* it has taken possession of pursuant to Section 2 hereof and *Cafe Partners hereby consents to the foregoing, renouncing its rights to the Equipment and any and all rights it may have pursuant to the Uniform Commercial Code as in effect in any applicable jurisdiction to require Royal Bank to dispose of the Foreclosed Collateral....* [Emphasis added.]

Third, JSA–2 described the requirement of section 28:9–505(2) that other secured creditors receive notice of the proposed foreclosure:

> Promptly upon execution of this JOINT SETTLEMENT AGREEMENT/RELEASE, Cafe Partners shall file with the U.S. Bankruptcy Court for the District of Columbia (the "Bankruptcy Court") a notice of intent to consummate the transactions described in Sections 2 and 3 of this JOINT SETTLEMENT AGREEMENT/RELEASE, and *shall cause a copy of such notice to be mailed to all appropriate parties.* [Emphasis added.]

Finally, JSA–2 clearly stated that Royal Bank's foreclosure was in full satisfaction of Cafe Partners' obligation:

> Royal Bank will mark the original executed copy of the Credit Note *"paid in full"* and will deliver such note to Cafe Partners. [Emphasis added.]

The effect of JSA–2, therefore, was to give Royal Bank possession of the collateral for its loan by means of strict foreclosure of its security interest, pursuant to D.C.Code § 28:9–505(2).

 With the effect of JSA–2 thus clarified, the rationale for our other conclusions becomes more apparent. First, since JSA–2 served as a vehicle for Royal Bank's foreclosure, rather than as an alternative to foreclosure, JSA–2 did not extinguish Royal Bank's security interest. But whether JSA–2 had any effect on Royal Bank's security interest is, in fact, irrelevant because Royal Bank acquired possessory rights in the collateral through foreclosure pursuant to JSA–2.

 Second, Royal Bank's UCC–3 Termination Statement did not affect Royal Bank's rights because it was filed only as required by the Purchase and Sale Agreement between Royal Bank and LeRoy Adventures, and only *after* Royal Bank had foreclosed on its security interest. Moreover, whether the UCC–3 Termination Statement extinguished Royal Bank's security interest is irrelevant because JSA–2 gave Royal Bank a possessory interest in the collateral through foreclosure.

In sum, what we meant to say in our prior opinion, and what we now conclude, is that JSA–2 was an agreement describing Royal Bank's strict foreclosure of its security interest in Cafe Partners' assets. Furthermore, it is irrelevant whether JSA–2 or the UCC–3 Termination Statement served to extinguish

---

It is, of course, axiomatic to the efficacy of a security interest that a foreclosure is generally effective as to all the debtor's rights in the collateral to which the security interest originally attached. *See* D.C.Code §§ 28:9–504(4), 28:9–203(1)(c); *Wachovia Bank & Trust Co. v. McCoy,* 270 S.E.2d 164, 166 (W.Va.1980).

7. While we concluded that Royal Bank and Cafe Partners executed JSA–2 in an attempt to comply with the requirements of section 28:9–505(2) for foreclosure, we did not address whether Royal Bank in fact complied with that provision because appellees did not argue on appeal that Royal Bank had failed to do so.

Royal Bank's security interest because JSA–2 gave Royal Bank, and hence its successor, LeRoy Adventures, a possessory interest in the collateral through foreclosure.

### III

■■■ We also grant rehearing to correct our earlier statement that *"as a matter of law,* the lease must be read as permitting the removal of the HVAC by Cafe Partners, and hence by Royal Bank and, in turn, LeRoy Adventures." *Leroy I,* 640 A.2d at 201 (emphasis added). The trial court, in granting appellees' Rule 41(b) motion for involuntary dismissal at the close of the plaintiff's case, concluded that "the HVAC did not fall within the category of 'personal property' which Cafe Partners owned and which could be removed from the premises upon termination of the lease." *Id.* at 200. Relying on the court's additional finding that "the HVAC could be removed without irreparably damaging the realty," *id.* at 201, we reversed the trial court's ruling and concluded that, under the lease, the HVAC was removable "as a matter of law." Appellees argue in their petition for rehearing that we should not have relied on the trial court's finding of removability, since it dismissed the case before they had an opportunity to introduce any evidence. Instead, appellees contend, we should remand to allow them to present evidence on the removability of the HVAC.

Appellant appears to concede—and we agree—that appellees are entitled on remand to offer evidence as to whether the HVAC can be removed without irreparably damag-

ing the leased premises.[8] Super.Ct.Civ.R. 41(b), as it existed at the time of trial,[9] provided in part:

> After the plaintiff, in an action tried by the Court without a jury, has completed the presentation of evidence, the defendant, *without waiving the right to offer evidence in the event the motion is not granted,* may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. [Emphasis added.]

"Under ... Rule 41(b), a defendant moving for a directed verdict retains the right to present evidence against the plaintiff's case whether its motion is denied at the trial or appellate level." *International Union, UAW v. Mack Trucks, Inc.,* 917 F.2d 107, 110–111 (3d Cir.1990). Appellees—defendants below—therefore have not waived their right to offer evidence. Accordingly, we withdraw our previous statement that "as a matter of law" the lease must be read as permitting the removal of the HVAC, *Leroy I,* 640 A.2d at 201, and remand the case to allow appellees to present evidence on the issue of whether the HVAC is removable from the premises under the terms of the Cafe Partners lease.

*It is so ordered.*

---

8. Appellant argues in its response to the petition for rehearing:

> It may be, as Appellees now urge, that the Trial Court's determination that the property could be removed without irreparably damaging realty was not necessary to the appeal and that, on remand, Appellees are not precluded from relitigating this determination. Alternatively, it may turn out that Appellees are bound by

this ruling because they actually introduced substantive evidence during Appellant's case-in-chief. These are matters that are customarily to be determined *on remand* in the Trial Court; the existence of such questions does not warrant reconsideration.

9. Rule 41 was amended in May 1993, more than a year after this case was tried.