*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## Nos. 15-CV-144 & 15-CV-221

### 2301 M Street Cooperative Association, Appellant/Cross-Appellee,

v.

### Chromium LLC, Appellee/Cross-Appellant.

Appeals from the Superior Court
of the District of Columbia
(CAB-6766-08)

(Hon. Michael L. Rankin, Trial Judge)

(Argued September 15, 2016                     Decided June 6, 2019)

*Thomas F. Murphy* for appellant/cross-appellee.

*Stephen O. Hessler* for appellee/cross-appellant.

Before Blackburne-Rigsby, *Chief Judge*,[*] and Glickman and Fisher, *Associate Judges*.

Opinion for the court per curiam.

Opinion by *Chief Judge* Blackburne-Rigsby, concurring in part and dissenting in part, at page 17.

---

[*] Chief Judge Blackburne-Rigsby was an Associate Judge at the time of argument. Her status changed to Chief Judge on March 18, 2017.

PER CURIAM: These consolidated appeals arise from a dispute between a tenant and the new owner over the correct formula for calculating rent increases under the parties' lease agreement. At issue is whether to use the rent escalation formula explicitly set forth in the lease agreement, or the formula used by the prior landlord for nearly thirty years. The rent would be much higher if the landlord had employed the formula in the lease during that period, and that formula would call for greater rent increases in the future. The tenant, 2301 M Street Cooperative Association ("the Cooperative"), argues that the lease agreement is ambiguous and should be interpreted to conform to the prior landlord's actual practice. Alternatively, the Cooperative argues that, by their past practice, the then-parties to the lease implicitly modified its rent formula. The new and current owner and landlord, Chromium LLC ("Chromium"), argues that the rent escalation formula in the lease is not ambiguous and should apply as written.

The trial court agreed with Chromium insofar as prospective application of the lease formula is concerned. However, it rejected Chromium's argument for retroactive application of that formula to past rent increases, which would result in a higher base rent for future calculations. For the reasons that follow, we affirm.

# I. Factual and Procedural Background

## A. *History of the Lease Agreement*

On May 6, 1980, property developer M & 23rd Partnership entered into an air rights lease agreement[1] with the Cooperative for the residential portion of an unfinished building located at 2301 M Street in Northwest DC.[2]  The lease contains a rent escalation clause that recalculates rent every five years, beginning ten years after the "Lease Commencement Date," based on fluctuations in the Consumer Price Index ("CPI").  Section 4 (A) of the lease defines the "Lease Commencement Date" as "the date of this Lease Agreement."  Section 5 (B)(1) sets forth a specific formula for calculating rent increases[3] and provided that rent "shall be increased, but never

---

[1] "Air rights" are a type of property interest in real estate that convey the right to use and develop the space above the land.

[2] Initially, the lease agreement was set for a period of fifty years, but the parties amended the lease to increase its duration twice, first to seventy years, and then to ninety-nine years in December 1981 and May 1983, respectively.

[3] Section 5 (B)(1) provides the following formula:

> The new Annual Residential Rent shall be equal to the sum of (a) the Annual Residential Rent payable during the Lease Year immediately preceding and (b) said Annual Residential Rent times twenty-five percent (25%) of a fraction (x) the numerator of which is the CPI at the date of adjustment and (y) the denominator of which is the CPI at the immediately preceding date of adjustment (except

decreased, by the application of the terms of this [section]." On December 8, 1981, one year and seven months after the lease was signed, M & 23rd Partnership conveyed the Residential Section to the Cooperative with a signed warranty deed.[4]

In 1983, the Pedas Group acquired the lease and assumed the interests of M & 23rd Partnership as the Cooperative's new landlord. It retained Lenkin Company Management to manage the building. Lenkin Company Management, and by extension the Pedas Group, interpreted the "Lease Commencement Date" in Section 4 (A) to be December 8, 1981, the date the Residential Section was delivered to the Cooperative, rather than May 6, 1980, the date the lease agreement was signed by all parties. Additionally, Lenkin Company Management and the Pedas Group applied the following formula to determine the amount of the rent increase pursuant to the rent escalation clause under Section 5 (B)(1):

$$\text{Current Rent} \times \frac{(\text{Current CPI} - \text{Base CPI})}{\text{Base CPI}} \times .25$$

---

for the first denominator which shall be the CPI at the commencement of the fifth Lease Year hereof).

[4] Melvin and Edward Lenkin were the general partners of M & 23rd Partnership. Edward Lenkin also served as the president of the Cooperative and signed the lease as lessee on behalf of the Cooperative. Moreover, Lenkin Company Management, owned by the Lenkin family, initially managed both the Commercial and Residential Sections of the property.

This formula, referred to by the parties as the "Historic Method," increases rent by twenty-five percent of the rate of inflation each time it is adjusted. However, the Historic Method does not conform to the rent escalation formula explicitly set forth in Section 5 (B)(1), which states that current rent should be multiplied by twenty-five percent of a fraction, "the numerator of which is the CPI at the date of adjustment and [] the denominator of which is the CPI at the immediately preceding date of adjustment[:]"

$$\text{Current Rent} \times \frac{\text{Current CPI}}{\text{Base CPI}} \times .25$$

We refer to this version of the rent escalation formula as the "Textual Method." The Textual Method would almost always increase rent by a minimum of twenty-five percent because in periods of inflation, the CPI rises. In contrast, the Historic Method would only increase rent by one quarter of the rate of inflation, because the Historic Method subtracts the "Base CPI" from the "Current CPI" in the numerator of the fraction.[5]

---

[5] The Cooperative uses the 2010 adjustment as an example. Under the Historic Method, annual rent would increase by 3.54 percent, from $69,890.52 per year to $72,365.98 per year. Under the Textual Method, however, it would increase by 28.25 percent, from $69,890.52 to $89,634.60 per year, resulting in an additional $17,268.62 per year.

Lenkin Company Management used the Historic Method to calculate rent escalations in 1991, 1995, 2000, and 2005.[6] In November 2007, Chromium acquired the property and assumed the responsibilities of the Pedas Group under the lease. It did not retain Lenkin Company Management as property manager. When the time for another rent escalation calculation approached in 2010, Chromium informed the Cooperative that it would not use the same method of calculating rent escalations as the previous landlord. Instead, it would calculate rent increases based on the Textual Method set forth by the express language of Section 5 (B)(1). It also would interpret the "Lease Commencement Date," pursuant to Section 4 (A) of the lease, to be the date the lease was signed, May 6, 1980, as opposed to the date the building was delivered to the Cooperative, December 8, 1981.

### B. The Litigation

The Cooperative refused to pay the rent as adjusted using the Textual Method, and Chromium responded by terminating the lease and filing suit for possession of

---

[6] Notice of the first increase was provided in March 1991, though the rent escalation was deemed effective as of December 1990.

the property.[7]    After the Cooperative failed to vacate the Residential Section, Chromium filed a suit for ejectment.  The trial court consolidated these cases.

The trial court held a limited bench trial to determine: (1) the correct interpretation of the rent escalation clause, and (2) the correct "Lease Commencement Date."  The trial court heard testimony from:  David Schaeffer, the managing member of Chromium; James Chang, the head accountant for Empire Leasing (Chromium's management company); Brian DeHaven, the Director of Commercial Operations for Lenkin Company Management; and Yoav Katz, the Cooperative's expert witness and certified public accountant.  At the close of trial, the trial court ordered the parties to file post-trial briefs.[8]  Based on the admitted testimony and evidence presented by both parties, the trial court concluded that (1)

---

[7] There is a lengthy litigation history between these two parties dating back to 2008, not all of which is relevant here.  On June 15, 2010, the parties reached a settlement agreement on many issues other than the correct interpretation of the rent escalation clause.  The settlement agreement broke down, however, after the Cooperative refused to pay rent as calculated by the Textual Method.

[8] The Cooperative filed a motion to reopen the record in order to admit two letters that "demonstra[te] precisely how the rent escalation clause was interpreted by the property's landlord . . . in 1991, and then in 1995," and to assert the affirmative defenses of estoppel and statute of limitations.  The trial court determined that the Cooperative's omission of additional affirmative defenses at trial was tactical, and found that the 1991 and 1995 letters "cannot fairly be considered new evidence and their admission is seen more as completing the record."  The motion was accordingly denied.

the rent escalation clause, as written, is unambiguous in setting forth the Textual Method for calculating the rent escalation; and (2) the Lease Commencement Date is May 6, 1980 — the date the original parties entered into the lease agreement, and not December 8, 1981, the date that the Pedas Group and Lenkin Company Management had used. The trial court accordingly entered judgment in favor of Chromium and ordered that beginning in 2010, the Textual Method be used to calculate rent increases going forward.

After trial, Chromium issued a notice to the Cooperative that it was recalculating all of the past rent escalations using the Textual Method, thus dramatically increasing the base rent used to calculate the 2010 rent adjustment. The recalculation raised the Cooperative's rent from $7,503.33 to $17,700.04 per month. In response, the Cooperative filed a motion to alter or amend the trial court's decision to clarify the obligations of the parties. The trial court issued an order clarifying that Chromium could only apply the Textual Method "going forward" from the 2010 rent increase, rather than retrospectively adjusting the calculations from 1990. This appeal and cross-appeal followed.

## II.  Discussion

### A. *The Rent Escalation Clause is Unambiguous*

Leases of real property are analyzed under established principles of contract law. *Sobelsohn v. Am. Rental Mgmt. Co.*, 926 A.2d 713, 718 (D.C. 2007); *Javins v. First Nat'l Realty Corp.*, 428 F.2d 1071, 1075 (D.C. Cir. 1970). "This court adheres to the 'objective law' of contracts . . . ." *Howard Univ. v. Best*, 484 A.2d 958, 967 (D.C. 1984) (citations omitted).  Under the objective law of contracts, the contracting parties' "unexpressed" intent at the time the contract was entered into is "irrelevant" if the contractual terms are otherwise unambiguous, "or unless there is fraud, duress, or mutual mistake." *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009) (internal quotation marks and citation omitted). We follow the parol evidence rule, which excludes extrinsic evidence to assist in contract interpretation and limits our analysis to the plain meaning of the contractual terms if they are otherwise unambiguous. *Abdelrhman v. Ackerman*, 76 A.3d 883, 888 (D.C. 2013).  Because this appeal arises from a bench trial, we review the trial court's factual findings under the "clearly erroneous" standard. *In re Estate of Munawar*, 981 A.2d 584, 586 (D.C. 2009); D.C. Code § 17-305 (a) (2012 Repl.).  Whether a contract is ambiguous is a question of law that we review *de novo*. *Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 299 (D.C. 2006).

The Cooperative argues that Section 5 (B)(1) is facially ambiguous because: (1) the Textual Method would contradict the stated goal of the rent escalations to account for fluctuations in the CPI; (2) the Textual Method renders superfluous Section 5 (B)(1)'s instruction that rent "shall be increased, but never decreased, by the application of the terms of this [section;]" and (3) the surrounding circumstances at the time the lease agreement was executed indicate that the parties intended to adopt the Historic Method. We are unpersuaded by these arguments and conclude that the language of Section 5 (B)(1) leaves no room for ambiguity.

The Textual Method does not contradict Section 5 (B)(1)'s instruction that the annual rent shall be adjusted "*based on fluctuations* in the most recently published [CPI]." (emphasis added). Indeed, the Textual Method does account for such fluctuations because the amount of the rent increase correlates with the change in CPI between the previous and current five-year periods. If the CPI at the date of adjustment is less than the base CPI, then the rent will increase by less than twenty-five percent. If the CPI remains the same, then rent will increase by exactly twenty-five percent. If the CPI goes up (as is typical), then rent will increase by greater than twenty-five percent. In this manner, rent is adjusted "based on fluctuations" in the CPI. We thus discern no contradiction between the Textual Method and an intent to base rent increases on fluctuations in the CPI .

Second, though Section 5 (B)(1)'s instruction that rent "shall be increased, but never decreased, by the application of the terms of this [section]," may be somewhat superfluous when considered in combination with the Textual Method, the two sections are certainly consistent with one another. The Textual Method guarantees that rent will always increase, in line with the instruction of Section 5(B)(1). In any event, this small superfluity cannot render ambiguous what is otherwise a clearly expressed formula in the lease agreement.

Third, the Cooperative argues that the rent escalation clause is ambiguous because the Historic Method is more consistent with formulas commonly used at the time the lease was executed, and makes more sense given that the lease requires the tenant to pay for all operating and maintenance costs for the tenant's portion of the building (thereby providing the landlord with "inflation protection"). We decline, however, to look outside the four corners of the document in interpreting the unambiguous formula set forth in Section 5 (B)(1). *See Bolle v. Hume*, 619 A.2d 1192, 1197 (D.C. 1993) (stating that parol evidence is inadmissible "to show an intention contrary to that expressed in an unambiguous written contract") (citation

and internal quotation marks omitted). Accordingly, we conclude that Section 5 (B)(1) of the lease agreement is not ambiguous.[9]

Additionally, we conclude that the "Lease Commencement Date," defined in Section 4 (A) of the lease as the "date of this lease agreement," unambiguously refers to May 6, 1980, the date the agreement was executed. The Cooperative argues that it should be December 8, 1981, because Section 4 (A) also states that "this Lease shall be for a period of fifty (50) years, plus the number of days that elapse between the date of this Lease Agreement and the date Lessor delivers to Lessee possession of the Residential Section of the Building . . . ." The Cooperative claims that a "reasonable reading" of this section indicates that the lease commencement date should be derived by taking the date of the lease agreement and adding the number

---

[9] The Cooperative argues for the first time on appeal that there was a mutual mistake in drafting the rent escalation clause justifying equitable reformation of the contract. This issue is not properly before us. *See Cannon v. District of Columbia*, 569 A.2d 595, 596 (D.C. 1990) ("Appellant did not raise this contention in the trial court and therefore we cannot consider the issue on appeal[.]") The Cooperative did not ask the trial judge to equitably reform the contract, and in any event, the trial judge was not persuaded that there had been a drafting mistake in rejecting testimony from Mr. Katz, the Cooperative's expert, that the rent escalation provision was "poorly drafted." *See Lumpkins v. CSL Locksmith, LLC*, 911 A.2d 418, 424 (D.C. 2006) (holding that reformation requires a factual finding of mutual mistake and proof by clear and convincing evidence). Additionally, we note that reformation is available as a remedy "except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected." Restatement (Second) of Contracts § 155 (Am. Law. Inst. 1981).

of days it took for the developer to deliver possession of the Residential Section of the building. We disagree. Had the parties intended for the lease commencement date to be the date of delivery, then the lease would have specifically stated so, as they clearly were able to distinguish between the two events in the provision quoted above. We decline the Cooperative's invitation to look to outside evidence to determine the lease commencement date.

## B. The Lease Was Not Modified

The Cooperative next argues that the lease was modified by the then-parties' long-time practice of calculating rent increases using the Historic Method. At trial, however, the Cooperative did not argue that there had been a modification, and consequently the trial court never considered the issue. Therefore, any argument of such on appeal is waived. *See Cannon*, supra, footnote 9.

But even assuming that the issue of modification was implicitly presented to the trial court, the Cooperative's argument is not persuasive. Although parties are free to modify a contract at any time, modification requires mutual consent. *Hershon v. Hellman Co.*, 565 A.2d 282, 283 (D.C. 1989). Whether there was mutual consent is a factual issue, and, critically, what is missing here is any evidence that the parties mutually consented to modify the rent escalation formula. The trial court specifically characterized the issue as a "near thirty year *misapplication* of the

formula . . . ." (emphasis added). There can be no mutual consent to modify if the parties were merely misapplying the formula set forth in the lease. Indeed, if the parties actually did consent to modify the lease, it is inexplicable (and unexplained) why they did not put it in writing. While the parties may modify an agreement via their conduct, *see Sam Rayburn Dam Elec. Coop. v. Fed. Power Comm'n*, 515 F.2d 998, 1009 (D.C. Cir. 1975), the record here does not support the Cooperative's assertion that its conduct was an intentional attempt at modification, rather than a mistaken belief as to what the rent escalation formula was. The Cooperative's mere acceptance of the prior landlord's favorable calculations of rent increases does not establish that there was mutual consent to modify the rent escalation clause. Moreover, even if we were to conclude that the lease agreement had been modified via the then-parties' conduct, Chromium as the successor-in-interest would only be bound by the modification if it had actual or constructive notice of the modification. *See Stanley's Cafeteria, Inc. v. Abramson*, 226 Va. 68, 73 (1983) ("[A]ll successors in interest with knowledge of such a modification may be bound thereby unless they agree otherwise."). There is no evidence that Chromium had actual notice of the conduct allegedly resulting in a modification, and the assertion that it had

constructive notice is questionable at best. For these reasons, the Cooperative is not entitled to the relief it seeks.[10]

## C. *Chromium Is Not Entitled to Retroactive Application of the Textual Method*

Lastly, we are not persuaded by Chromium's argument, raised on cross-appeal, that the trial court should have allowed it to retroactively apply the Textual Method to all of the previous rent increases. Chromium argues that retroactive application would be equitable to "correct the historical misapplication" and employ the "correct" base for the 2010 rent increase, in effect increasing the Cooperative's rent from $7,503.33 per month to $17,700.04 per month. However, nothing in the lease provision permits Chromium to retroactively recalculate rent escalations.[11] Furthermore, the record reveals that Chromium claimed at trial that, applying the Textual Method to the 2010 rent increase, it was seeking $7,503.33 in monthly rent (as opposed to the $6030.50 yielded by the Historic Method). Chromium did not seek to recalculate the 1991 to 2005 rent escalations in arriving at this amount.

---

[10] Contrary to the Cooperative's assertions, the trial court did not err by refusing to consider its estoppel and statute of limitation arguments. "[T]he failure to raise affirmative defenses constitutes a waiver of those defenses." *Goldkind v. Snider Brothers, Inc.*, 467 A.2d 468, 471 (D.C. 1983); *see also* D.C. Super. Ct. Civ. R. 8(c). The record does not support the Cooperative's assertion that it had implicitly raised these affirmative defenses before the trial court.

[11] Section 5 (B)(1) bases the rent increase on the rent "payable during the Lease Year immediately preceding."

Having sought this amount and prevailing at trial, Chromium cannot, post-trial, contradict its earlier position and claim that it is, in fact, permitted to recalculate all of the prior rent increases as if they had been taken by the prior landlord according to the Textual Method. *See, e.g., Porter Novelli, Inc. v. Bender*, 817 A.2d 185, 188 (D.C. 2003) ("A party with full knowledge of the facts, which accepts the benefits of a transaction, contract . . . *or order* may not subsequently take an inconsistent position to avoid the corresponding obligations or effects.") (internal quotation marks and citation omitted). In addition, as the trial court noted, its prospective ruling yields the outcome that Chromium bargained for and expected when it purchased the property. The trial court thus did not abuse its equitable discretion in limiting the use of the Textual Method to prospective rent increases.

## III.   Conclusion

Based on the foregoing reasons, we affirm the trial court's determination that the Textual Method applies to calculating rent increases under the parties' lease agreement. We conclude that the claim that the rent escalation clause was modified by the parties' long-standing conduct was not properly raised before the trial court and, in any event, is not persuasive. Finally, we conclude that the trial court properly

determined that the Textual Method is to be applied prospectively, starting with the 2010 rent adjustment.

*So ordered.*

BLACKBURNE-RIGSBY, *Chief Judge*, concurring in part and dissenting in part: I agree with my colleagues that the plain language of the lease agreement supports Chromium's interpretation of the rental escalation formula and the lease commencement date. Plainly, Section 5 (B)(1) of the lease agreement contemplates the use of the Textual Method for the calculation of rent increases and Section 4 (A) defines the "Lease Commencement Date" as the date the lease agreement was signed, which was indisputably on May 6, 1980.

However, I must disagree with my colleagues' conclusion that, for this reason, Chromium should prevail on appeal, or that the Cooperative is therefore without remedy, despite the fact that for nearly thirty-years, the parties (in my view) knowingly followed the Historic Method for calculating rental increases. I believe we must look to the parties' conduct and historical practices to determine whether the lease terms have been modified in the years since the lease was executed. After

all, the parties always have the right "to contract anew . . . and to modify or rescind" any terms of their agreement. *Clark v. Clark*, 535 A.2d 872, 876 (D.C. 1987).

Here, although the plain language of the lease favors Chromium's interpretation, the long-standing, multi-decade conduct between first the Cooperative and M & 23rd Partnership, and later the Cooperative and the Pedas Group favors the Cooperative's position that the parties must have intended, by their actions, to apply the Historic Method. Likewise, the parties' actions of consistently using December 8, 1981, the date the building was handed over to the Cooperative, for calculating rental increases demonstrates that the parties intended to modify the "Lease Commencement Date" from the actual date of signing, May 6, 1980, to December 8, 1981.

Our case law, and persuasive case law from other jurisdictions, support the proposition that mutual, consistent, and contrary behavior deviating from the precise language of the parties' contract, can implicitly demonstrate the parties' intent to modify the literal terms of the contract, and that such intent should be given legal effect. *See, e.g.*, *Stancil v. First Mount Vernon Indus. Loan Ass'n*, 131 A.3d 867, 872 (D.C. 2014). For example, courts have said that a contract may be deemed modified if the parties' course of conduct is consistent with acceptance of the

modified conditions. *Int'l Bus. Lists, Inc. v. Am. Tel. & Tel. Co.*, 147 F.3d 636, 641 (7th Cir. 1998); *Pollard v. Southdale Gardens of Edina Condo. Ass'n, Inc.*, 698 N.W.2d 449, 452-54 (Minn. Ct. App. 2005) (concluding that a condominium association's conduct in failing to enforce the "no pets" rule for twelve years may, in and of itself, give rise to an implied modification of the condominium rules).

Contrary to the majority's position, I believe the trial court did implicitly consider whether the Cooperative and the previous landlords modified the rental escalation formula by their actions. The trial court characterized the dispute in this case as "whether the proper construction of the rent escalation clause in the lease is guided by the *historical behavior* of the prior parties to the agreement or, instead . . . [by] a literal construction of the clause." (emphasis added). In framing this dispute, the trial court found, as a factual matter, that the Pedas Group and the Cooperative had employed the Historic Method for calculating rental increases for nearly thirty years. The court also alluded to the fact that use of the Historic Method was intentional on the part of the Lenkins because the Lenkins were on both sides of the initial transaction and that "[t]he evidence here supports the finding that Edward Lenkin, either himself or through his agent, set out a brief and simple formula to escalate rent payments in incremental terms," which the court characterized as a "near thirty year misapplication of the formula while Edward Lenkin was managing

both sides of the contract . . . ." While the trial court interpreted this historic practice as a "misapplication" of the rental escalation clause in the lease agreement, I believe that the parties' long-standing conduct of calculating rent increases using the Historic Method demonstrates a mutual intent to change the formula for calculating rental increases as it was literally written.[1]

The record reflects that the Cooperative and the Pedas Group intended to modify the literal terms of the lease agreement by their course of conduct subsequent

---

[1] The issue of modification presents a mixed question of fact and law. "Whether the *acts* of the parties show intention to modify or abandon the original agreement is a question of fact." *United States v. Casle Corp.*, 895 F. Supp. 420, 428 (D. Conn. 1995) (emphasis added). However, the ultimate question of whether an enforceable modified contract exists in light of the parties' course of conduct is a question of law, which this court reviews de novo. This is because contract modification is the formulation of a new contract, requiring the same elements as we would require in proving the existence of any other enforceable agreement. *See Vasily v. MONY Life Ins. Co. of Am.*, 104 F. Supp. 3d 207, 214 (D. Conn. 2015). The determination of whether there is an enforceable contract, and whether the elements of contract formation are satisfied, is a question of law that we review de novo. *See United House of Prayer for All People v. Therrien Waddell, Inc.*, 112 A.3d 330, 338 (D.C. 2015); *see also Steven R. Perles, P.C. v. Kagy*, 473 F.3d 1244, 1249 (D.C. Cir. 2007) ("We review de novo the legal question of whether the facts as found by the [trial court] demonstrate the existence of an enforceable contract."). By that same token, the determination of whether there is an enforceable modified contract based on the parties' course of conduct is likewise a question of law that we review de novo. *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009).

to its signing.[2]  The Pedas Group utilized the Historic Method to calculate rental

increases, which were "memorialized in a series of rent adjustment letters issued on

behalf of the landlord in 1991, 1995, 2000, and 2005."  The Cooperative further

accepted the Historic Method formula for calculating rent increases by paying the

increased rent as calculated by the Pedas Group.  Specifically, the 2000 and 2005

letters[3] notifying the Cooperative of rental increases explained how the Pedas Group

and Lenkin Company Management calculated its rental increase using the Historic

Method formula.[4]  These letters show, in my view, that the Pedas Group did not

employ the Historic Method by mistake, but that instead it was an intentional

deviation from the rent escalation formula found in the lease agreement.  The letters

---

[2] *See Pocatello Hosp., LLC v. Quail Ridge Med. Inv'r, LLC*, 330 P.3d 1067, 1075 (Idaho 2014) ("For modification to take place, 'the minds of the parties must meet as to any proposed modification' . . . . The fact of agreement may be implied from a course of conduct in accordance with its existence and assent may be implied from the acts of one party in accordance with the terms of a change proposed by the other.").

[3] The 1991 and 1995 rent escalation letters do not appear to be in the joint appendix submitted by the parties on appeal.

[4] For example, in the 2000 letter, the property manager informed the Cooperative president that rent will increase to $67,283.57, effective December 8, 2000.  The letter then explained how the Pedas Group came to this conclusion using the Historic Method:

$$\text{Current Rent } [\$65{,}419.13] \times \frac{(\text{Current CPI } [509.0] - \text{Base CPI } [456.6])}{\text{Base CPI } [456.6]} \times .25$$

also demonstrate that the Cooperative was aware that the formula used for calculating rent increases differed from the formula as stated in the lease agreement. These were not unsophisticated parties. The Cooperative paid all of the rent increases as calculated by the Pedas Group and Lenkin Company Management, which shows that the Cooperative accepted the Pedas Group's use of the alternative Historic Method for calculating rent increases.

Moreover, the fact that father and son Lenkin were initially on both sides of the transaction — Melvin and Edward Lenkin were partners of the property developer, M & 23rd Partnership, and Edward Lenkin was also president of the Cooperative, who signed the lease agreement for the residential section of the property — supports my conclusion that the parties intended to apply the Historic Method because, despite the literal terms of the lease agreement, Section 5 (B)(1)'s language on how to calculate rental escalation clauses was clear, but both parties nonetheless did not follow the formula from the outset. Accordingly, we should construe the parties' long-standing conduct of calculating rent increases using the Historic Method as demonstrating their mutual assent to a change in the formula for

calculating rental increases that resulted in a modified and essentially new contract. *See Vasily*, 104 F. Supp. 3d at 214.[5]

Further, while modification of a contract typically requires new consideration, *Hershon v. Hellman Co., Inc.*, 565 A.2d 282, 283 (D.C. 1989), there is an exception — no new consideration is required if the contract has been fully executed. *Clark*, 535 A.2d at 877. A contract is considered to have been fully executed when both parties have fulfilled their contractual obligations under the modified terms without protest. *Amatangelo v. Schultz*, 870 A.2d 548, 555 (D.C. 2005). Because the Cooperative had always timely paid its past rent, and those payments were duly accepted by the Pedas Group, their long-standing conduct precludes the suggestion that the modified terms are unenforceable for want of consideration. *See Vigelius v. Vigelius*, 13 P.2d 425, 427 (Wash. 1932) (concluding that the parties modified their alimony arrangement despite the fact that the husband was "still obligated to make . . . future monthly payments" because he had "fully executed" the agreement over a period of twelve years); *see also Clark*, 535 A.2d at 877 (holding that one cannot accede to a modified contract for nine years and then seek to repudiate the

---

[5] *See KBQ, Inc. v. E.I. du Pont de Nemours & Co.*, 6 F. Supp. 2d 94, 99 (D. Mass 1998) (citations and internal quotation marks omitted) ("The subsequent course of conduct must be of such specificity as to leave *no doubt* of the intention of the parties to change what they previously solemnized by formal document.") (emphasis added).

modifications). For these reasons, I must disagree with my colleagues that the plain language of the lease agreement governs over the historic thirty-year practices of the Cooperative and the past landlords. Instead, I believe that the rental escalation clause was modified to reflect the Historic Method.[6]

For the same reasons, I believe that the Cooperative and the Pedas Group's course of conduct in treating the lease commencement date for purposes of rental escalations as December 8, 1981, instead of May 6, 1980, modified the lease commencement date. The Pedas Group and the Cooperative had a longstanding practice of adjusting rent using December 8, 1981, the date M & 23rd Partnership conveyed the residential section to the Cooperative, as the date to trigger calculations

---

[6] Section 14 (J) of the lease agreement provides a "no oral modification" clause. However, "[u]nder contract law, it is well-settled that a written contract may be orally modified or rescinded by a subsequent oral argument, even where the contract contains express language prohibiting oral modification . . . . The justification for this rule is that the existence of an express bar against oral modification does not remove the parties' continuing rights to contract anew on the subject and to modify or rescind the oral modification provision like any other term of the contract." *Clark*, 535 A.2d at 876 (citation omitted). Moreover, the statute of frauds does not prevent enforcement of this agreement. At the very least, the Cooperative and the Pedas Group's decades-long use of the Historic Method constitutes "part performance" which precludes application of the statute of frauds. *District of Columbia Hous. Fin. Agency v. Harper*, 707 A.2d 53, 55 (D.C. 1998) (stating that the statute of frauds did not apply where "appellant occupied the building for nearly three years and paid rent, and appellee renovated the building in reliance on the lease").

of the periodic rent increases from 1991 through 2005.[7] This conduct occurred over the course of four rent escalations. In each instance, the Pedas Group utilized the December 8, 1981, date to calculate rent escalations, to which the Cooperative acceded. The parties' course of conduct demonstrated mutual assent to modify the lease commencement date to December 8, 1981.

Finally, I believe that Chromium, as the successor-in-interest to the Pedas Group, is bound by these modifications to the lease agreement. Successors-in-interest are bound by modifications made by predecessors, if the successor-in-interest has actual or constructive notice of the modified terms. *Stanley's Cafeteria, Inc. v. Abramson*, 306 S.E.2d 870, 873 (Va. 1983); *Tehan v. Thos. C. Peters Printing Co., Inc.*, 421 N.Y.S.2d 465, 467 (N.Y. App. Div. 1979). Moreover, an assignee stands in the shoes of the assignor and can have no greater rights than those possessed by the assignor. *See LeRoy Adventures, Inc. v. Cafritz Harbour Grp., Inc.*, 640 A.2d 193, 199 (D.C. 1994), *modified on reh'g*, 660 A.2d 908 (D.C. 1995); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 336, cmt. b. Here, the evidence

---

[7] It appears that in 1995, rent was escalated a year early. This deviation went unnoticed, and, since then, the conduct of the parties has been consistent in recalculating rent on December 8 every five years. This error does not affect our determination that the parties have modified the "Lease Commencement Date" by conduct.

credited by the trial court establishes that Chromium had actual or at the very least constructive notice that the Pedas Group and the Cooperative utilized a different rental escalation formula than the one written in the lease agreement. *See, e.g.*, *District of Columbia Hous. Auth. v. Pinkney*, 970 A.2d 854, 863 (D.C. 2009) (Constructive notice requires a showing that the condition existed "for a sufficient length of time" such that the party should have known about the condition). Mr. David Schaeffer, Chromium's managing member and fifty-one percent owner, who was responsible for purchasing the building on M and 23rd Street, admitted that in purchasing the building Chromium was "effectively stepping into [] Pedas' shoes." He further testified that he conducted due diligence and learned about the revenue streams[8] of the building, which he claimed were "way out of range with what the economic value of those floors six through nine would generate in retail income." Nonetheless, Chromium bought the property and Mr. Schaeffer testified that he was "bound by the specific terms and conditions that were entered into by the two Lenkins subsumed by the [Pedas Group]," and that he intended to "just follow the pattern and practice of increases that had previously been conducted by the previous

---

[8] Mr. Schaeffer testified that he "look[ed] at the commercial as well as the residential or air rights portion and the parking income for the entire building[,]" and observed that "proportionately the air rights lease[,] while it occupies close to fifty percent of the net rentable area of the entire structure[,] represents only about six or seven percent of the rental payment for the property."

owner." The duration of time that the Pedas Group and the Cooperative utilized the Historic Method for calculating rent increases, and the fact that the revenue streams had been reviewed by Chromium prior to their stepping into the shoes of the Pedas Group, lead me to conclude that Chromium had notice of and is therefore bound by the modifications to the lease agreement that were agreed to by the Pedas Group and the Cooperative.

I would therefore reverse the trial court's judgment in favor of Chromium.[9] The Cooperative, and the occupants of its forty-four residential units, should not be saddled with potentially yearly twenty-five percent increases or more in rent, which could be cost-prohibitive and debilitating, based on language within a contract that for all intents and purposes was never followed by the parties. In discounting the Cooperative's past conduct with the prior landlords, the trial court and the majority panel are, in my view, denying the parties' right to continually contract "anew." *Clark*, 535 A.2d at 876. For these reasons, I respectfully dissent in part.

---

[9] Since my view is that the Cooperative's method of calculating rental increases should prevail, I would likewise deny Chromium's cross-appeal as moot.