*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CV-0548

CAPITAL RIVER ENTERPRISES, LLC, *et al*., APPELLANTS,

V.

CHRISTOPHER ABOD, *et al*., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2022-CA-000258-R(RP))

(Hon. Hiram E. Puig-Lugo, Trial Judge)

(Argued March 7, 2023                    Decided September 21, 2023)

*Brian West*, with whom *Benjamin G. Chew* and *Andrew C. Crawford* were on the brief, for appellants.

*Nathan J. Bresee*, *David S. Panzer*, and *Joseph M. Creed*, with whom *Michael J. Bramnick* and *David H. Cox* were on the brief, for appellees Christopher Abod, Harry Roupas, and BCJCL, LLC.

*Spencer B. Ritchie*, with whom *Richard W. Luchs* and *Gwynne L. Booth* were on the brief, for appellee Premium Title & Escrow, LLC.

Before DEAHL and HOWARD, *Associate Judges*, and THOMPSON, *Senior Judge*.

DEAHL, *Associate Judge*: Capital River was a three-member LLC formed to buy and sell properties for profit. One of its members, Kuei-Yin Chang Liu, alleges

that the other two members defrauded Capital River. Specifically, Liu alleges that the other two members encumbered Capital River's property with two loans—after they forged Capital River's operating agreement to omit Liu's ownership interest— and then kept the money for themselves. In an important twist, Capital River's true operating agreement granted those two members the authority to take out the loans on Capital River's behalf anyhow, meaning any forgery was immaterial to their ability to do so. Capital River and Liu sued the grantors of those loans for quiet title and sued the escrow agent that facilitated them for negligence. The trial court found that each of their claims failed because the two members who took out the loans against the properties had the actual authority to enter into those transactions. The court therefore granted the grantor-defendants' motion to dismiss and granted the escrow agent's motion for summary judgment.

Capital River and Liu now appeal, arguing that the trial court erred in dismissing their quiet title claim because deeds entered into on the basis of a forged operating agreement are rendered void ab initio. For that proposition, they rely on *Smith v. Wells Fargo Bank*, in which we held that a forged power of attorney renders a deed void. 991 A.2d 20, 26 (D.C. 2010). We have never extended that rule beyond powers of attorney, however, and it does not make sense to extend the rule to the scenario we confront here, so we detect no error.

Capital River and Liu also challenge the trial court's grant of summary judgment to the escrow agent regarding their negligence claim. They argue that the escrow agent had a fiduciary duty to inform Capital River of certain information—namely, that two of its members were attempting to defraud it—and that the escrow agent failed to do so. Though the trial court technically granted pre-discovery summary judgment on this claim, the order was effectively a dismissal for failure to state a claim: the court concluded that Capital River and Liu would not have a viable claim, regardless of whether they could substantiate all of their factual allegations. We conclude that this order was erroneous and reverse it.

We affirm the trial court's grant of the motion to dismiss, and we reverse in part its grant of the motion for summary judgment as it relates to the negligence claim.

## I.

Kuei-Yin Chang Liu, Napoleon Ibiezugbe, and Kevin Falkner together formed Capital River Enterprises, LLC, to "purchase, develop and sell" for profit two parcels of property located at 2318-2322 Nicholson Street Southeast. The terms governing the LLC were laid out in two documents: an operating agreement and a memorandum of understanding (MOU), which was incorporated into the operating

agreement. These documents stated that, together, they constituted the "entire agreement among the Members."

The operating agreement stated that Liu would have a 50% ownership interest, while Ibiezugbe and Falkner would have 25% each. The parties agreed that Liu would finance the project, while Ibiezugbe and Falkner would conduct the day-to-day work of improving the properties. To that end, the MOU stated that Liu would contribute $1.6 million to the LLC. Around $1.4 million would be used to buy the property, and the remaining money would be used to pay for costs associated with development of the property. Meanwhile, Ibiezugbe and Falkner would be "responsible for . . . all maintenance costs of the property," "all expenses, costs and fees incurred after the exhaustion of the Planning and Permitting Funds," and "all actions necessary to hire, and fire, architects, engineers, lawyers and related professionals of their choosing to advance and complete the Project." Importantly, the MOU provided that "[a]ll major decisions and choices . . . shall be made by a two-third[s] majority vote of the Members, each of whom shall have one vote for each major decision required."

With the money Liu had invested, Capital River bought the Nicholson Street properties in October 2017, with Premium Title & Escrow, LLC, acting as its escrow

agent. About two years later, Ibiezugbe and Falkner took out two loans on behalf of Capital River, using the properties as security. In April 2019, Ibiezugbe and Falkner entered into a deed of trust (encumbering the properties) on behalf of Capital River with Christopher Abod and Harry Roupas, in exchange for a loan of $499,000. In November 2019, they entered into a second deed of trust on behalf of Capital River with BCJCL, LLC, in exchange for a loan of $375,000. Premium Title again acted as the escrow agent for both transactions.

Capital River and Liu[1] now allege that these loans were entered into for Ibiezugbe and Falkner's personal gain, that Liu was not aware of the transactions, and that Capital River did not profit from them. Specifically, Capital River alleges that Ibiezugbe and Falkner gave the lenders a forged operating agreement that named Ibiezugbe and Falkner as the sole members of the LLC, omitting any mention of Liu. Capital River further alleges that Ibiezugbe and Falkner deposited the loan funds into their personal accounts and that Capital River never received any money from the loans. According to Capital River, Liu did not find out about the loans until over a year later. At that time, the three members amended the operating agreement and MOU. The amendment stated that "the Parties acknowledge that [Ibiezugbe and

---

[1] This opinion refers to Liu and Capital River collectively as "Capital River" unless otherwise specified.

Falkner] have breached the [operating agreement] and MOU" and amended the MOU to give Liu sole decisionmaking power.

Capital River and Liu sued the loan grantors, Abod, Roupas, and BCJCL, and the escrow agent, Premium Title. Capital River sought quiet title against the grantor-defendants, asking the court to declare the two deeds void. It brought a claim of negligence against Premium Title, arguing that Premium Title breached its fiduciary duty, as an agent of the LLC, to inform the LLC of the alleged forgery. And it brought claims against all defendants for tortious interference with business relations, slander of title, and civil conspiracy.

The grantor-defendants filed a motion to dismiss under Rule 12(b)(6). The Superior Court granted the motion, dismissing all counts against those defendants on the basis that the plain language of the MOU granted Ibiezugbe and Falkner the actual authority to enter into the deeds. The court reasoned that this actual authority meant that "Capital River [wa]s responsible for Ibiezugbe and Falkner's agreements," so even a forged operating agreement would not render the deeds void ab initio—negating Capital River's quiet title claim. The court further reasoned that Ibiezugbe and Falkner's actual authority to enter into the deeds negated Capital River's claims of tortious interference, slander of title, and civil conspiracy, a ruling

Capital River does not directly challenge on appeal. *See Drake v. McNair*, 993 A.2d 607, 615 n.12 (D.C. 2010) (deeming an issue waived where party failed to include in her brief any substantive argument related to the issue).

Premium Title then filed a pre-discovery motion for summary judgment, which the court also granted. The court dismissed the tortious interference, slander of title, and civil conspiracy claims for the same reasons given in its previous order. And it dismissed the negligence claim, reasoning that because Ibiezugbe and Falkner had actual authority to enter into the deeds, "Premium Title's actions were consistent with Capital River's MOU and there was no 'fraud' perpetrated against Capital River that Premium Title had a duty to notify Plaintiffs of." Capital River now appeals.

## II.

Capital River makes three arguments. It argues that the trial court erred in (1) finding that Ibiezugbe and Falkner had actual authority to enter into the deeds; (2) dismissing its quiet title claim based on a finding that the forged operating agreement did not automatically void the deeds; and (3) granting Premium Title's motion for summary judgment as to the negligence claim. We disagree with the first two arguments but agree with the third. We address each argument in turn.

**A.**

The trial court found that the MOU granted Ibiezugbe and Falkner the actual authority to enter into the deeds. Capital River disputes that finding. We agree with the trial court.

We adhere to the objective law of contracts. *2301 M St. Coop. Ass'n v. Chromium LLC*, 209 A.3d 82, 86 (D.C. 2019). This means that "the contracting parties' unexpressed intent at the time the contract was entered into is irrelevant if the contractual terms are otherwise unambiguous, or unless there is fraud, duress, or mutual mistake." *Id.* (quotations omitted). Likewise, the parol evidence rule "excludes extrinsic evidence to assist in contract interpretation and limits our analysis to the plain meaning of the contractual terms if they are otherwise unambiguous." *Id.* at 87. A document is ambiguous only if "the provisions in controversy are[] reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings." *Sahrapour v. LesRon, LLC*, 119 A.3d 704, 708 (D.C. 2015) (quoting *Joyner v. Estate of Johnson*, 36 A.3d 851, 856 (D.C. 2012)).[2]

---

[2] The operating agreement states that Capital River "will be governed under the laws of the Commonwealth of Virginia," so there is at least an argument that we

The plain language of the MOU, incorporated into the operating agreement, unambiguously grants Ibiezugbe and Falkner the ability to take out loans against Capital River's assets. The MOU provides that "[a]ll major decisions and choices . . . shall be made by a two-third majority vote of the Members, each of whom shall have one vote for each major decision required." Ibiezugbe and Falkner are two of the three members of Capital River, comprising a two-thirds majority. Encumbering the property with a loan is undoubtedly a "major decision." While Capital River counters that the LLC's members did not contemplate taking out loans against the property, the plain terms of the MOU do not preclude them from doing so.

Capital River appeals to unwritten understandings between the members and the amendment that post-dates the loans to support its interpretation, but it may not look to either source to introduce ambiguity into an unambiguous contract. D.C. contract law prohibits the use of extrinsic evidence to contradict unambiguous language. *See 2301 M St. Coop.*, 209 A.3d at 87. And, in any case, the MOU itself rejects the use of any external sources of interpretation, by stating that it constitutes

---

should be applying Virginia law when interpreting it. No party makes that argument, however, and only one brief addresses Virginia's contract law, asserting that it is in accord with the District's on the above points. *See Westmoreland LG&E Partners v. Virginia Elec. & Power Co.*, 486 S.E.2d 289, 294 (Va. 1997). Because the parties seemingly agree that District law applies, and no party argues Virginia law would point to any different result, we apply the District's law.

"the full and complete terms of agreement by and between the Members." *See Adler v. Abramson*, 728 A.2d 86, 90 (D.C. 1999) ("The absence . . . of a limitation on which the parties had explicitly bargained, in a final agreement containing an integration clause (as this one did), is strong indication that the parties reasonably meant to bind themselves only by the words they employed."). As the trial court found, the MOU gave Ibiezugbe and Falkner the actual authority to take out loans against the properties.

**B.**

Capital River argues that, even if Ibiezugbe and Falkner had the authority to enter into the deeds and thereby encumber the properties, the deeds are nonetheless void ab initio because Ibiezugbe and Falkner relied on an allegedly forged operating agreement to enter into them. Capital River argues that acquiring property "by means of a forged instrument relating to the property" renders the deed void—and that an operating agreement is one such instrument. To support this argument, Capital River relies on *Smith v. Wells Fargo Bank*, in which we stated that a forged power of attorney would render void a deed of trust entered into using that power of attorney. 991 A.2d at 26. Capital River cites our statement in *Smith* that "even a bona fide purchaser cannot acquire a property right by means of a forged instrument

relating to the property." *Id.* at 31. Appellees counter that for a deed to be void ab initio, the deed itself must be forged, and *Smith* broadened that rule only to include forged powers of attorney—not to any other class of documents. We agree with them and conclude that the trial court's dismissal of the quiet title claim was proper.

We review a dismissal for failure to state a claim de novo. *See Johnson-El v. District of Columbia*, 579 A.2d 163, 166 (D.C. 1990). "All that is required for a complaint to be sufficient is 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Scott v. FedChoice Fed. Credit Union*, 274 A.3d 318, 322 (D.C. 2022) (quoting Super. Ct. Civ. R. 8(a)(2)).

Declaring a deed void ab initio is a drastic result. The deed is void not only against the parties to the deed, but also against any subsequent purchasers—even bona fide purchasers, who are completely innocent as to any wrongdoing that occurred. *Smith*, 991 A.2d at 26. As such, the situations that render a deed void ab initio are narrow: courts typically "have been circumspect at common law in finding a deed void *ab initio* and have limited [their] rulings regarding voidness to circumstances that go to the face of the deed, e.g., forgery." *Julian v. Buonassissi*, 997 A.2d 104, 120 (Md. 2010) (footnote omitted); *see Smith*, 991 A.2d at 26 n.10 (citing cases).

This rule has been slightly expanded to include forged powers of attorney. *Smith*, 941 A.2d at 26. A power of attorney is a unique document that confers special powers on its holder and is subject to special regulations. *See generally* Uniform Power of Attorney Act, D.C. Code §§ 21-2601.01 to -2604.03. "If . . . the Power of Attorney was forged, [the] execution of the deed of trust pursuant to the Power of Attorney is no better than if [the deed of trust] had been directly forged." *In re Baxter*, 320 B.R. 30, 31 (Bankr. D.D.C. 2004).

The rule that forged powers of attorney render deeds void has long been recognized. *See Unity Banking & Saving Co. v. Bettman*, 217 U.S. 127, 135 (1910). *Smith* is simply the latest in that long line of cases. Indeed, *Smith*'s language regarding "a forged instrument relating to the property" stems from the 1910 Supreme Court case of *Unity Banking & Saving Co. v. Bettman*, which held that a forged power of attorney rendered a deed void. *See id.* at 135 ("As against the true owner, a right of property cannot be acquired by means of a forged written instrument relating to such property."). That language, in context, referred to powers of attorney only. *See id.*; *see also In re Baxter*, 320 B.R. at 39 (using same language to discuss power of attorney); *Scotch Bonnett Realty Corp. v. Matthews*, 11 A.3d 801, 805 (Md. 2011) (same); *Shvartser v. Lekser*, 308 F. Supp. 3d 260, 265 (D.D.C.

2018) (same). We are not aware of any case to have interpreted that language to apply beyond powers of attorney.

We decline to extend that language to cover forged operating agreements. An operating agreement, unlike a power of attorney, is not a necessary prerequisite for entering into a deed; indeed, LLCs are not required to have written operating agreements at all. *See* D.C. Code § 29-801.02(10) (contemplating "oral" or "implied" operating agreements). Moreover, the "strong public policy favoring bona fide purchasers for value" supports limiting the circumstances in which deeds are rendered void. *See Scotch Bonnett*, 11 A.3d at 810. If the forgery of any document submitted during a real estate transaction could render that transaction void, then real estate transactions would be significantly more uncertain—including for bona fide purchasers far removed from the initial forgery. It would also open the system up for gaming: for instance, a seller could forge a peripheral document in order to give it the option to unilaterally void the transaction at a later date. For these reasons, we decline to extend the forgery rule to documents other than powers of attorney (and the deed itself).

## C.

Third, Capital River argues that the trial court erred in granting summary judgment to Premium Title on Capital River's negligence claim. We agree.

We review a grant of summary judgment de novo. *Onyeoziri v. Spivok*, 44 A.3d 279, 283 (D.C. 2012). "Our role 'is not to act as factfinder and to resolve factual issues,' but rather to review the record to determine if there is 'a genuine issue of material fact on which a jury could find for the non-moving party.'" *Id.* (quoting *Holland v. Hannan*, 456 A.2d 807, 814-15 (D.C. 1983)). Whether the trial court was correct to grant summary judgment in this case reduces to whether it was correct to conclude, as a matter of law, that Premium Title had no duty to alert Capital River of incipient loans that the MOU authorized Ibiezugbe and Falkner to take out on the LLC's behalf.

Motions for summary judgment are typically filed after discovery has been conducted, but they may be filed "at any time" beforehand. Super. Ct. Civ. R. 56. Here, the trial court ruled pre-discovery because it concluded that Capital River's claims failed as a matter of law, even if they were factually substantiated. The trial court reasoned that "there was no 'fraud' perpetrated against Capital River," and that "Premium Title could not have violated the applicable standard of care," because the

loans did not violate the terms of the MOU. On appeal, Premium Title defends that reasoning, stating that "[n]o amount of expert testimony or discovery could rescue [Capital River's] deficient claims." That leaves us to assess the legal basis for the trial court's grant of summary judgment, rather than assessing any evidentiary support for Capital River's allegations (which is typically at issue when reviewing grants of summary judgment).

With that background the trial court's ruling was effectively no different from a Rule 12(b)(6) dismissal, and we assess whether it was correct to rule—assuming that Capital River could substantiate all of its factual allegations—that Capital River's claims failed as a matter of law. "[A] summary-judgment motion . . . made on the basis of the pleadings alone . . . functionally is the same as a motion to dismiss for failure to state a claim or for a judgment on the pleadings." *See* 10A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2713 (4th ed. Apr. 2023 update) (footnotes omitted). We consider de novo whether, taking Capital River's allegations as true, it has "allege[d] the elements of a legally viable claim." *Chamberlain v. Am. Honda Finance Corp.*, 931 A.2d 1018, 1022-23 (D.C. 2007).

Escrow agents owe a fiduciary duty of care to both buyer and seller in a real estate transaction. *Wagman v. Lee*, 457 A.2d 401, 405 (D.C. 1983). This includes

"a duty of good faith and candor in affairs connected with the undertaking, including the duty to disclose to the principal 'all matters coming to [the agent's] notice or knowledge concerning the subject [] of the agency, which it is material for the principal to know for his protection or guidance.'" *Aronoff v. Lenkin Co.*, 618 A.2d 669, 687 (D.C. 1992). Thus, in *Aronoff*, we said that an escrow agent breached his duty of care by failing to disclose to the buyer that the title was not in insurable condition (something he knew because he was also the purchaser's title insurer). *Id.* We cited the Restatement (Second) of Agency § 381, which states that "an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have." *See id.* The first comment to this section elaborates:

> An agent may have a duty to act upon, or to communicate to his principal or to another agent, information which he has received, although not specifically instructed to do so. The duty exists if he has notice of facts which, in view of his relations with the principal, he should know may affect the desires of his principal as to his own conduct or the conduct of the principal or of another agent.

Restatement (Second) of Agency § 381, cmt. a.

In its complaint, Capital River alleged that Premium Title knew the operating agreement submitted for the loan transactions was forged. The complaint further

alleges the following: Premium Title was Capital River's escrow agent for both its initial purchase of the properties and for its entry into the deeds of trust one and a half and two years later. Premium Title received a true copy of the operating agreement when Capital River initially purchased the properties with the money Liu had invested, and Premium Title was aware that Liu alone had funded the purchase. When Premium Title received the forged operating agreements less than two years later, it "would have, of course, run a check in its system on any prior dealings with Capital River, and its system would have reflected the 2017 purchase of the Property as well as the documents associated with that deal (including the real Operating Agreement)." Indeed, the same person, Lola Shannon, served as the closing agent for the initial purchase and both loan transactions. Thus, Premium Title "should have known (and did know) that fraud was taking place," and was negligent in not informing Capital River of this fact.

Taking all this as true, Capital River has alleged sufficient facts to make out a claim of negligence. Information that two LLC members are forging LLC documents is information that is "relevant to affairs entrusted to [Premium Title]," especially where Capital River alleged that Premium Title's duties as escrow agent included obtaining a copy of the operating agreement and an affidavit identifying

the full membership of Capital River. *See* Restatement (Second) of Agency § 381. And it is certainly information that Capital River "would desire to have." *See id.*

Premium Title makes two arguments in response. First, echoing the trial court, it argues that it cannot have been negligent because Ibiezugbe and Falkner had the actual authority to enter into the transaction. This is a non sequitur. The relevant inquiry is whether Capital River would want to know that its agents were forging documents. A reasonable factfinder could certainly conclude that it would, regardless of whether those agents had the authority to act on its behalf or not.

Second, Premium Title argues that there is no reason to believe it knew the operating agreement was forged because the deeds of trust were entered into years after Capital River's initial purchase of the properties (which is when Premium Title received a true copy of the operating agreement). This might be true, but it is a factual dispute inappropriate for resolution prior to discovery, and it was not the basis for the trial court's pre-discovery ruling. Discovery could uncover whether Premium Title "ha[d] notice of facts which, in view of [its] relations with [Capital River], [it] should [have] know[n] may affect [Capital River's] desires." Restatement (Second) of Agency § 381 cmt. a. Capital River also alleged that "Premium Title was required to obtain and submit an affidavit of members

accurately identifying the current membership of the LLC" and that "it is basic business practice for title companies, when dealing with an LLC party, to request a unanimous consent of members to take any actions." These are classic factual disputes for the factfinder to resolve, perhaps with the aid of expert testimony elucidating what steps a reasonable escrow agent would take in the present circumstances. *Cf. Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 200 (D.C. 1991) (discussing the "requirement that a plaintiff introduce expert testimony to prove the standard of care where the subject matter is too technical for the lay juror"). In sum, the trial court erred in granting summary judgment to Premium Title at this stage.

## III.

For the foregoing reasons, we affirm the order granting Abod, Roupas, and BCJCL's motion to dismiss and we reverse in part the order granting Premium Title's motion for summary judgment as to the negligence claim. We remand for further proceedings consistent with this opinion.

*So ordered.*